UNITED STATES BANKRUPTCY COURT

MIDDLE DISTRICT OF LOUISIANA

IN RE:
GEORGE KENT WELLS                                    CASE NO.: 05-11102
      DEBTOR
                                                     CHAPTER 7
BRIAN ANDREWS
      PLAINTIFF                               ADV. NO.: 05-1119

V.

GEORGE KENT WELLS
      DEFENDANT

MEMORANDUM OPINION

Brian R. Andrews sued chapter 7 debtor George Kent Wells for a determination that Wells's debt to Andrews was excepted from discharge under 11 U.S.C. §523(a)(4).[1]  Wells denied all liability to Andrews, who before the bankruptcy had obtained a $10,000 state court default judgment against the debtor.

This memorandum opinion explains why $4,665 of Wells's debt to Andrews is nondischargeable.

FACTS

Andrews and Wells formed Digital Connections, L.L.C. in July 2001 to open a cell phone retail store and credit repair business in Baton Rouge.  Wells became the managing member of Digital Connections[2] though the two men never entered into a written operating agreement.  Andrews lived in Fort Worth, Texas and Wells remained in Baton Rouge to run the business.

---

[1]  Bankruptcy Code §523(a)(4) excepts from discharge debts for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

[2]  Articles of organization (Plaintiff's Exhibit 9).

By agreement, Andrews's initial capital of $10,000 was deposited into a Hibernia National Bank account.[3]  Both Andrews and Wells were authorized signatories on the bank account.  Wells's depletion of the limited liability company's initial capital is the basis for plaintiff's complaint.

Digital Connections eventually did lease retail space, enter into an agreement to become a Sprint dealer, and also acquire some store trappings, including banners and a display of dummy cell phones.  However, the evidence did not establish whether the store ever actually opened its doors to the public.

Wells was the sole manager of Digital Connections and conceded on cross-examination that he was responsible for accounting for its funds.  Wells testified that he had arranged to acquire some of the business furnishings, called on clients and paid for unspecified printed marketing materials.  He also insisted that he paid three months rent from the Hibernia account but on cross-examination backtracked, eventually conceding that in fact he paid only $1600 to landlord All State Financial in August 2001 for that month's rent and the lease deposit.

After about four months, and the sale of possibly as few as four cellular telephones (two of which Andrews sold to friends), Digital Connections failed.  Its initial capital was depleted and its bank account overdrawn.  Wells could not explain at trial how the company's account came to be overdrawn by late September 2001.  He also could not explain the purpose of several transactions appearing on the company's bank statements.[4]

Andrews insisted that he and Wells did not agree that Wells could draw any compensation from the company's initial capital.  According to Andrews, Wells was to receive

---

[3]   Andrews testified that Wells also was to have contributed capital to the enterprise but never did so.

[4]   Hibernia National Bank statements (Plaintiff's Exhibit 8).

compensation only after the business became profitable.  Wells insisted that he was entitled to be paid for his services as managing member, despite acknowledging that he and Andrews never agreed on a specific salary.  In any case, Wells did not know the total amount Digital Connections paid him before it failed.

Wells wrote numerous checks to himself or to the order of cash.  He also agreed that Andrews did not write any checks on the account.  Wells identified a group of checks totaling $2,730 payable to him [5] from the limited liability company's account.  Four of the checks, adding up to $555,[6] were drawn after Digital Connections' checking account had been overdrawn.[7] Although Wells could not identify the specific checks representing compensation, he testified that all the checks were either for his pay or to reimburse him for marketing materials.[8] However, he admitted that Digital Connections never issued a W-2 or 1099 form confirming amounts it paid him, and he acknowledged that he did not report the compensation to the Internal Revenue Service as income for 2001.

Wells never gave Andrews an accounting for his expenditures from the company's funds but at trial contended that Andrews never asked him for one.  Perhaps as justification for this, the defendant explained that he and the plaintiff spoke often by telephone and that Andrews could monitor transactions in the Hibernia account by internet.

---

[5]  Plaintiff's Exhibit 4 *in globo*.  These checks were drawn between August 20, 2001 and October 13, 2001.

[6]  Plaintiff's Exhibit 4 *in globo*.  Beginning with check number 526 on September 28, 2001, Wells overdrew the Hibernia checking account.

[7]  The Hibernia checking account was overdrawn on September 27, 2001, according to the company's monthly statement found in Plaintiff's Exhibit 8.

[8]  For example, the memorandum on check number 510 indicates that it was a payment to continue Wells's health insurance through his former employer.  (Plaintiff's Exhibit 6).

In September 2002, having lost his investment, Andrews sued Wells in Louisiana state court to recover his $10,000.[9]  His petition alleged that Wells breached his fiduciary responsibilities to Digital Connections and Andrews and that Wells engaged in self-dealing in violation of his duties to Digital Connections and Andrews.  Andrews confirmed a $10,000 default judgment against Wells, who had failed to answer Andrews's petition.[10]

## ANALYSIS

### I.  PRECLUSIVE EFFECT OF THE STATE COURT DEFAULT JUDGMENT

Neither party raised the threshold issue of the preclusive effect of the state court default judgment.  The United States Supreme Court has held that issue preclusion[11] principles apply in section 523(a) discharge exception proceedings,[12] though regardless of the preclusive effects of the state court default judgment, this court has exclusive jurisdiction to determine dischargeability of Wells's debt to Andrews.[13]

In considering the preclusive effect of a state court judgment, a federal court must determine what preclusive effect a court of that state would give to the judgment.[14]  Thus, this court's inquiry begins with a review of Louisiana principles of issue preclusion, found in La. R.S.

---

[9]   Plaintiff's Exhibit 2.

[10]   Plaintiff's Exhibit 3.

[11]   The United States Supreme Court described collateral estoppel, or issue preclusion, as a doctrine providing that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Dowling v. U.S.*, 493 U.S. 342, 347 (1990).  Louisiana courts have held that issue preclusion provides that "once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue in a different cause of action between the same parties." *Interdiction of Stephens*, 930 So.2d 1222, 1226 (La. App. 2[d] Cir. 2006).

[12]   *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991).

[13]   *Matter of Gober*, 100 F.3d 1195, 1201 (5th Cir. 1996), citing *Grogan*, 498 U.S. at 284 n.11.

[14]   *Gober*, 100 F.3d at 1201, citing *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985).

13:4231.[15]  Issue preclusion specifically is governed by La. R.S. 13:4231(3), which provides that

a judgment is conclusive in any subsequent action between the plaintiff and the defendant "with

respect to any issue actually litigated and determined if its determination was essential to that

judgment."[16]  Louisiana courts have held that an issue is "actually litigated" for preclusion

purposes when a party raises an issue and a court undertakes a determination of the issue.[17]

Under the common law construction of the term "actually litigated," from which the Louisiana

definition is taken,[18] default judgments do not give rise to collateral estoppel in later litigation

because "the essential foundations of issue preclusion are lacking for want of actual litigation or

actual decision of anything – [and because] a defendant may suffer a default for many valid

reasons other than the merits of the plaintiff's claim."[19]

      Andrews did not produce any evidence that he had actually litigated the merits of his

petition in obtaining the default judgment in state court.  Accordingly, the plaintiff's default

judgment against Wells is not entitled to preclusive effect under La. R.S. 13:4231.

---

[15] *Stephens*, 930 So.2d at 1226 (stating that "La. R.S. 13:4231 embraces the broad usage of the phrase 'res judicata' to include both claim preclusion (res judicata) and issue preclusion (collateral estoppel)").

[16] *In re Dyson*, 277 B.R. 84, 88-89 (Bankr. M.D. La. 2002) (recognizing that Louisiana has codified issue preclusion in La. R.S. 13:4231(3)).

[17] *See Ponderosa Associates, Ltd. v. Verret*, 714 So.2d 956, 958 (La. App. 3d Cir. 1998).  In *Ponderosa*, the plaintiff first sued the defendant in a Colorado state court.  The defendant moved to dismiss the suit on the basis of lack of personal jurisdiction.  The Colorado court took evidence and concluded that it did have personal jurisdiction. When defendant did not appeal the ruling and failed to answer, plaintiff took a default judgment.  Plaintiff then moved to enforce the Colorado default judgment in Louisiana state court.  The Louisiana trial court refused to enforce the judgment, concluding that the Colorado court lacked personal jurisdiction over defendant.  The Louisiana Third Circuit Court of Appeal reversed, holding that the Colorado default judgment was entitled to preclusive effect as to personal jurisdiction under La. R.S. 13:4231(3) because the issue was actually litigated in Colorado before entry of the judgment.

[18] *See Sanchez v. Georgia Gulf Corp.*, 853 So.2d 697, 706 (La. App. 1st Cir. 2003) (stating the principle of issue preclusion is set forth in La. R.S. 13:4231(3)).

[19] 18A CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4442 (2006)

II.  ANDREWS HAS STANDING TO SUE

Neither party raised Andrews's standing to sue, though whether Andrews or the company is entitled to recover for Wells's alleged misuse of the initial capital is an obvious issue.

Federal courts must examine their own jurisdiction, which necessarily involves determining a plaintiff's standing.[20]  "[S]tanding 'is perhaps the most important of [the jurisdictional] doctrines.'"[21]  Therefore, the court must address the issue, even though the parties did not raise it.

Managers of a limited liability company owe fiduciary duties to the limited liability company and other members, La. R.S. 12:1314(A)(1).  The Louisiana Court of Appeal recently held that members of a limited liability company were the proper parties to pursue claims against other members of the company for losses stemming from alleged breaches of fiduciary duty to the limited liability company and its members, where the individual members allegedly sustained harm as a result of alleged misconduct.[22]  The court based its conclusion by analogizing to jurisprudence recognizing that a shareholder may sue for breach of fiduciary duty to a corporation "[i]f the breach of fiduciary duty causes a direct loss to the shareholder or causes damage affecting the shareholder personally…."[23]

Wells does not dispute that he did not contribute any capital to the limited liability company.  Andrews, the sole remaining member, contributed the capital and, therefore, alone

---

[20]  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (although no party raised standing, the court must address the issue).

[21]  *Id.*, citing *Allen v. Wright,* 468 U.S. 737, 750 (1984).

[22]  *Monroe v. Baron One, L.L.C.*, 902 So.2d 529, 532-33 (La. App. 5th Cir. 2005) (citations omitted).

[23]  *Baron One*, 902 So.2d at 533-34, citing *Sun Drilling Products Corp. v. Rayborn*, 798 So.2d 1141 (La. App. 4th Cir. 2001), *writ denied,* 807 So.2d 840 (La.2002) (applying La. R.S. 12:91, which imposes fiduciary obligations on officers and directors of Louisiana corporations analogous to those imposed on limited liability company members by La. R.S 12:1314(A)(1)).

suffered the alleged loss.  Requiring Andrews to sue on behalf of a defunct limited liability

company on this record would exalt form over substance.  Thus, the facts compel the conclusion

that Andrews has standing to pursue the claim.

III.  PART OF WELLS'S DEBT IS NOT DISCHARGEABLE UNDER 11 U.S.C. §523(a)(4)

A.  *Wells Committed a Defalcation While Acting Within a Fiduciary Capacity.*

### 1.  Wells was a Fiduciary Within the Meaning of Section 523(a)(4).

The next issue is whether a managing member of a Louisiana limited liability company is

a fiduciary within the meaning of 11 U.S.C. §523(a)(4), which excepts from discharge debts "for

fraud or defalcation while acting in a fiduciary capacity."  Wells was a fiduciary within the

meaning of section 523(a)(4).

Louisiana law provides that when management is reserved to the members of a limited

liability company, a member "[s]hall be deemed to stand in a *fiduciary relationship* to the limited

liability company and its members…."[24] (emphasis added).  Moreover, if management is

reserved to the members, the member manager must "account to the limited liability company

and *hold as trustee* for it any profit or benefit derived by him…."[25] (emphasis added).

Under Fifth Circuit jurisprudence including *Texas Lottery Commission v. Tran (Matter of

Tran)*,[26] state statutes purporting to create fiduciary relationships alone do not create a fiduciary

relationship for the purposes of section 523(a)(4).  However, other Fifth Circuit decisions

suggest that this does not end the inquiry.  Specifically, in *Moreno v. Ashworth*,[27] the Fifth

Circuit held that a debtor who was an officer of a corporation occupied a relationship to the

---

[24]  La. R.S. 12:1314(A)(1).

[25]  La. R.S. 12:1314(A)(5).

[26]  151 F.3d 339 (5th Cir. 1998).

[27]  892 F.2d 417 (5th Cir. 1990).

corporation and its stockholders that rendered him a fiduciary for purposes of 11 U.S.C.

§523(a)(4).  As a result, the debtor's liabilities for self-dealing were not dischargeable.  Also in

*LCP Investment Partnership v. Bennett*,[28] the Fifth Circuit extended its analysis to partnerships,

concluding based on Texas jurisprudence[29] that the managing partner of the managing partner of

a limited partnership was a fiduciary of the limited partners for purposes of section 523(a)(4).

   *Moreno* and *Bennett* read together lead to the conclusion that a debtor occupies a

fiduciary relationship for the purposes of section 523(a)(4) where a state statute imposes a

fiduciary relationship on a debtor by virtue of his relationship with or office in a business entity,

and the debtor actually takes part in managing the entity.[30]  Wells's position as managing

member of Digital Connections was analogous to those of the managing partner and officer in

*Moreno* and *Bennett.*  Accordingly, he was a fiduciary within the meaning of 11 U.S.C.

§523(a)(4).

## 2.  Wells committed a defalcation for the purposes of 11 U.S.C. §523(a)(4).

   The Fifth Circuit has defined defalcation as a "willful neglect of duty, even if not

accompanied by fraud or embezzlement."[31]  The Fifth Circuit held in *Matter of Schwager*[32] that

"willful neglect" is judged by a recklessness standard.[33]  This definition was based in part on

---

[28]  989 F.2d 779 (5th Cir. 1993).

[29]  *Bennett*, 989 F.2d at 786, citing *Huffington v. Upchurch,* 532 S.W.2d 576 (Tex. 1976), as the primary authority for the imposition of trustee-like duties on the managing partner of a partnership.

[30]  *See* 4 COLLIER ON BANKRUPTCY ¶ 523.10[2] (15th ed. rev. 2006) (suggesting that unless additional facts exist, section 523(a)(4) generally does not apply to frauds of agents, bailees, brokers, factors, partners and others situated similarly.)

[31]  *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 115 (5th Cir. 1993); *Bennett*, 989 F.2d at 790; *Moreno* 892 F.2d at 422.

[32]  121 F.3d 177 (5th Cir. 1997).

[33]  *Id*. at 185 n.12.

*United States v. Boyle*,[34] in which the Supreme Court defined "willful neglect" in a statute regarding the penalty for late filing of estate tax returns as "a conscious, intentional failure or reckless indifference." Although defalcation may not require actual intent, it does require some level of mental culpability.[35]

The Fifth Circuit has offered several examples of conduct constituting a defalcation for purposes of 11 U.S.C. §523(a)(4). In *Bennett* the court held that debts arising from self-dealing and breaches of the duty of good faith and fair dealing within the partnership context were nondischargeable defalcations.[36] *Moreno* held that a corporate president's debt for improper cash advances from the company was a nondischargeable defalcation.[37] In *Sheerin v. Davis* a majority shareholder's debt for improperly receiving informal dividends to the exclusion of the minority shareholder was a nondischargeable defalcation.[38] "These cases have all involved financial misconduct by fiduciaries and have all consistently applied the Fifth Circuit rule that defalcation is a willful neglect of fiduciary duty."[39]

Wells offered no convincing explanation for the $4665 he spent through checks payable either to himself or cash. He could not identify the specific checks he wrote to compensate himself, or those he drew on the account as reimbursement for alleged business expenses. Moreover, he conceded that Digital Connections never issued a W-2 or 1099 form reflecting

---

[34]  469 U.S. 241, 245 (1985).

[35]  *Schwager*, 121 F.3d at 185.

[36]  989 F.2d at 791.

[37]  892 F.2d at 418.

[38]  3 F.3d at 114.

[39]  *Schwager*, 121 F.3d at 185. *See also In re Jackson*, 141 B.R. 909 (Bankr. N.D. Tex. 1992), where the bankruptcy court ruled debtors had committed a defalcation based on evidence that they had withdrawn substantial sums from an insolvent corporation while it was not paying its creditors.

sums the company paid him.  Wells also could not explain at trial how the Digital Connections

bank account came to be overdrawn at the end of September 2001 or the reason he continued to

make checks payable to himself or cash afterward.  This testimony, and the other evidence,

undermines the debtor's claims and betrays his "conscious indifference"[40] to the management of

Digital Connections.

Only that portion of the debt affected by the debtor's wrongdoing is nondischargeable.[41]

Thus, Wells's expenditure of $1,600 for rent and the rent deposit was not a defalcation[42] nor was

his payment of $50 to Kristi Welch for printing and distributing advertising flyers.  However, the

$4,665 in checks Wells wrote to himself and to cash do represent defalcations.

> ### B.  Andrews did not Prove that Wells Committed Fraud While Acting in a Fiduciary Capacity, or that Wells Committed Embezzlement or Larceny.

For the purposes of section 523(a)(4) fraud is defined as it is for 11 U.S.C.

§523(a)(2)(A).[43]  Thus, to establish fraud the plaintiff must prove that:

1)  the debtor made a representation;

2)  he knew that it was false at the time;

3)  he made it with the intention and purpose of deceiving the creditor;

4)  the creditor relied on the representation; and

5)  the creditor suffered loss or damage as the proximate result of the

    representation.[44]

---

[40]  *Boyle*, 469 U.S. at 245.

[41]  *Matter of Cross*, 666 F.2d 873, 880 (5th Cir. 1982), citing *Danns v. Household Finance Corp.*, 558 F.2d 114, 116 (2[d] Cir. 1977).

[42]  The rent deposit presumably was forfeited when Digital Connections failed to pay subsequent months' rent, although the record contains no evidence of that.

[43]  *In re McDaniel*, 181 B.R. 883, 887 (Bankr. S.D. Tex. 1994).

Although Wells was a fiduciary within the meaning of section 523(a)(4), Andrews did not prove that Wells intended to defraud him.

Likewise, Andrews did not prove that Wells committed embezzlement or larceny. Under section 523(a)(4), the phrase "while acting in a fiduciary capacity" does not qualify the words "embezzlement" or "larceny."[45] Therefore, any debt resulting from the debtor's embezzlement or larceny is excepted from discharge under section 523(a)(4).

The meanings of embezzlement and larceny for bankruptcy purposes are governed by federal common law.[46] For the purposes of section 523(a)(4), *embezzlement* is defined as "[t]he fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come…."[47] To establish a claim of embezzlement under section 523(a)(4), the plaintiff must prove that: (1) the debtor appropriated the funds for his own benefit; and (2) the debtor acted with fraudulent intent or deceit.[48]

*Larceny* is defined as the "fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the taker's use and with intent to permanently deprive the owner of such property."[49] It differs from embezzlement because the initial taking of

---

[44]  *Id*. at 887, citing *In re Houtman*, 568 F.2d 651 (9th Cir. 1978); *In re Miller*, 5 B.R. 424 (Bankr. W.D. La. 1980).

[45]  COLLIER at ¶ 523.10[2].

[46]  *In re Adams*, 348 B.R. 368, 373 (Bankr. E.D. La. 2005).

[47]  *Adams*, 348 B.R. at 373, citing *In re Imbody*, 104 B.R. 830, 840 (Bankr. N.D. Ohio 1989).

[48]  *Adams*, 348 B.R. at 373, citing *In re Hartman*, 254 B.R. 669, 674 (Bankr. E.D. Pa. 2000).

[49]  *Adams*, 348 B.R. at 373, citing *Hartman*, 254 B.R. at 674. For purposes of section 523(a)(4), a bankruptcy court is not bound by the state law definition of larceny, but may follow federal common law. 4 COLLIER ON BANKRUPTCY ¶ 523.10[2], citing *In re Barrett*, 156 B.R. 529 (Bankr. N.D. Tex. 1993).

the victim's property must be unlawful. Fraudulent intent is essential to both larceny and embezzlement.[50]

In *In re Adams*[51] the bankruptcy court considered a claim that the debtor (a widow with signatory authority on her late husband's account), who had failed to communicate with her stepson regarding debtor's use of funds deposited in the husband's account, had committed embezzlement or larceny under 11 U.S.C. §523(a)(4). Because the evidence supported a finding that the debtor was authorized to pay debts from the account, the debtor's use of money in the account did not constitute fraud or embezzlement. Therefore the debt was dischargeable.

In contrast to *Adams*, although the evidence concerning Wells's ability to pay himself a salary from the initial capital of Digital Connections conflicted, it does not support a finding that the parties' agreement barred Wells from paying himself anything, or that Wells acted with fraudulent intent. As a result, Wells's payments to himself or for his benefit did not constitute embezzlement or larceny within the meaning of Bankruptcy Code section 523(a)(4).

## CONCLUSION

As the managing member of a limited liability company, the debtor stood in a fiduciary relationship with the other member of the company. His use of $4,665 for which he cannot account is a defalcation under 11 U.S.C. §523(a)(4) and excepted from his discharge.

Baton Rouge, Louisiana, November 21, 2006.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

[50] *Adams*, 348 B.R. at 373, citing *Hartman*, 254 B.R. at 674.

[51] 348 B.R. 368 (Bankr. E.D. La. 2005).